The CITY OF SPRINGFIELD, Missouri, A Municipal Corporation, at the Relation of the Board of Public Utilities, of Springfield, Missouri, Plaintiff–Appellant,

v.

EVENTS PUBLISHING CO., L.L.C., Defendant–Respondent.

No. 21395.

Missouri Court of Appeals, Southern District, Division Two.

Sept. 22, 1997.

Rex C. McCall, Springfield, for Appellant.

James E. Miller, Springfield, for Respondent.

SHRUM, Judge.

This case involves Missouri's Sunshine Law, §§ 610.010–.030.[1] The justiciable controversy presented by this case is whether the names and addresses of a city's new

1. All statutory references herein are to RSMo · 1994 unless otherwise specifically stated.

utility customers are nonexempt public records that the city must make available for public inspection and copying, except residential customers who request confidentiality. We answer, "Yes." Another issue on appeal is whether the trial court erred in awarding attorney fees. We answer, "No."

We modify the judgment so that it addresses the justiciable controversy presented. We affirm the judgment as modified.

The City of Springfield (City) is a constitutional charter city that operates its utility systems through its Board of Public Utilities (Board). Events Publishing Co., L.L.C. publishes a newspaper in Springfield known as Daily Events (Respondent).

In October 1995, Respondent wrote to Board's records custodian and asked that she give Respondent access to "all of the information you can provide on new commercial and residential utility hookups." Respondent's stated intention was to publish that information in its newspaper. Board's custodian of records notified Respondent that the Board was in doubt about what records it was required to disclose under the Sunshine Law.

City then filed this declaratory judgment suit asking the court to declare Board's obligations under the Sunshine Law to reveal Board's records concerning its utility customers. City alleged Respondent wanted "access to all City Utilities records 'on new commercial and residential utility hookups'...." Continuing, City's petition stated:

"[Board] maintains a wide variety of records containing information on its customers including, without limitation, the following: names, addresses, phone numbers, social security numbers, dates of birth, places of employment, payment history, utility usage, credit histories, bank account information, information on when the customer will be at home so that indoor meters can be read, information on gaining access to houses so that meters can be read, records of conversations with customers, forwarding addresses, and names, addresses, and phone numbers of customers' relatives. Many, if not most, customers consider this information confidential."

City's prayer was for a declaration on whether the records sought by Respondent are public records under § 610.010, whether Board's records are protected from disclosure by § 610.021, and what records Board must reveal under the Sunshine Law.

Respondent answered that all it wanted were the names and addresses of City's new commercial and residential utility customers. Respondent also asked for an award of "reasonable attorney fees...."

Respondent filed a counterclaim asking the court to order City to make Board's "records of the names and addresses of new commercial and residential utility hookups open to the public for inspection as requested by [Respondent]" and to award attorney fees and expenses. Later, Respondent tempered this request in an amended counterclaim that asked that City be ordered to open Board's "records of the names and addresses of new residential utility hookups ... unless the residential utility customer ... has requested that his or her name and address not be disclosed...."

City moved for a summary judgment, alleging that there was no genuine issue as to any material fact. City repeated the allegation from its petition about the character and breadth of information involved. City listed the types of customer information contained in Board's records and supported its claims on this subject with affidavits. Additionally, City adduced evidence via affidavits that some customers used secret passwords for their accounts. Other customers were in federal witness protection programs. Still other customers expressed concerns that disclosure of information on their accounts might lead to their being found and harmed by spouses, ex-spouses, or persons bent on revenge. Some consumers were apprehensive that information in their utility records might enable a third party to shut off utilities, aid third parties in entering the customers' buildings, or indicating when the customers would be gone, e.g., on vacation.

Still other evidence established that the records on existing customers were voluminous, were contained in 1,494 pages of microfiche, and would cost $2.30 per account for City to review the records. City also estab-

lished that it would cost $1.15 per account to notify customers that City was going to give out information about their accounts. City's motion requested the court to declare that "the records requested by [Respondent] are not public records because their release could only result in a foreseeable risk of harm to [City's] customers."

Respondent answered by saying that City, in its petition and summary judgment motion, was attempting to unnecessarily broaden the scope of their controversy. Respondent restated that it wanted "only future [utility customer] accounts" and nothing more. Moreover, even as to those records, Respondent did not request disclosure "where the name and address of the new account [was] to remain confidential."

Next, City filed a pleading entitled "Response To The Additional Facts of Defendant." In this document, City acknowledged the limited scope of Respondent's request for disclosure. However, City continued to argue its entitlement to summary judgment, saying that release of utility customer names would inevitably lead to someone being seriously hurt. It also contended that it would be "difficult and time consuming and unreliable" to learn which customers might want their names kept confidential.

Thereon, the trial court entered summary judgment, declaring initially that it was only deciding the "actual controversy" set forth in Respondent's pleadings. The judgment mentioned a separate memorandum that contained the court's reasoning. The court found that the public records described in Respondent's counterclaim could not be closed. The judgment then ordered City to give Respondent access to "all its records of commercial and residential utility hookups, including names and addresses...." Further, City was ordered to pay $1,500 toward Respondent's attorney fees.

This appeal by City followed.

■ City's first point maintains that the trial court erred in ordering City to disclose *all* of its records of commercial and residential utility hookups. To a limited extent we agree with City's contention. However, we reach our conclusion for reasons other than those urged by City.

■ When a public governmental body proposes to close its records but is in doubt about the legality of so acting, it may sue to find out the propriety of its proposed act. § 610.027.5. However, any such suit must involve specific documents that the public governmental body has been requested to reveal, as opposed to records that might be, but have not yet been requested. *See Fulson v. Kansas City Star Co.*, 816 S.W.2d 297 (Mo.App.1991). As explained in *Fulson:*

> "Courts do not make abstract declarations of law. Courts decide concrete cases. There must be a specific factual matrix for our declarations of law, for our decisions are anchored in the facts under consideration and are limited by those facts.
>
> . . . .
>
> "In the absence of a concrete case upon which the court's decree can have a conclusive effect, there is no justiciable controversy. The absence of a justiciable controversy is said in some of our cases to deprive the court of 'jurisdiction' to enter a declaratory judgment. It is perhaps more nearly correct to say that a petition for declaratory judgment is addressed to the court's discretion, and that *it is an abuse of discretion to undertake to issue a declaratory judgment without a justiciable controversy to act upon.*" (citations omitted) (emphasis supplied).

*Id.* at 299–300[2].

Here, in its final suggestions and argument to the trial court, City stated:

> "[I]t is apparent from [Respondent's] Reply to [City's] Motion for Summary Judgment that [Respondent] no longer is interested in anything else. Since it is clear that the only records that [Respondent] is seeking are the names and addresses of new commercial and residential utility customers, then *the request for all other records is moot.*"

The trial judge seemingly recognized the limited scope of this controversy. Thus, the judgment begins by stating it is limited to a "declaration of the rights of the parties to the actual controversy set forth in [Respon-

dent's] Counterclaim." Next, the judgment declares that Respondent "has a right to the disclosure of the public records described in the Counterclaim for the reasons stated in a separate Memorandum, accompanying this Judgment." The separate memorandum says: "[T]he proposed Amended Counterclaim merely guides the Court as to the extent of the actual controversy." By the amended counterclaim, Respondent sought only names and addresses of future commercial customers and names of those residential customers who did not request confidentiality. Yet, the trial court stated in its judgment: "[City] is ordered to permit [Respondent] to inspect and copy *all of its records of commercial and residential utility hookups,* including names and addresses . . . ." (emphasis supplied).

The justiciable controversy here concerns only the question of whether the names and addresses of new (future) commercial and residential hookups are public records under the Sunshine Law and whether Respondent has a right to inspect and copy those records. The trial court clearly understood the specific factual matrix for its declaration, yet inexplicably attempted to order relief beyond the case submitted. The part of this judgment ordering City to allow Respondent to inspect *all records* regarding commercial and residential hookups goes far beyond the justiciable controversy upon which the court may rule. *See Fulson,* 816 S.W.2d at 299. The trial court abused its discretion to the extent that it ordered relief without a justiciable controversy to act upon. *Id.* at 300[3].

■ Thus, we exercise our authority under Rule 84.14 to "give such judgment as the court ought to give." We amend the trial court's judgment to state:

"The City of Springfield and the Board of Public Utilities of Springfield are ordered to allow Events Publishing Co., L.L.C. (now Daily Events, Inc.) to inspect and copy the names and addresses of its new (future) commercial and residential utility hookups, except the names and addresses of residential utility hookups in which confidentiality has been requested by the utility customer. The City of Springfield and the Board of Public Utili-

ties of Springfield shall open the records specified above for inspection and copying by Events Publishing Co., L.L.C. (now Daily Events, Inc.) commencing with the issuance of the mandate from this court, and this judgment shall not be retroactive."

In light of our amendment of the trial court's judgment, the brunt of City's first point becomes moot. This follows because City's concern that harm might come to utility customers is alleviated by our amendment. Also, the amended judgment should relieve apprehension about the cost of notifying existing customers of their confidentiality rights. The amended judgment orders inspection and copying of only *new* commercial and residential utility hookups. It does not decide the status of City's records on existing commercial and residential utility hookups. Further, the amended judgment allows City to honor residential customers' requests to keep their names and addresses confidential.

■ A public record is defined generally in the Sunshine Law as including any record retained by any public governmental body. § 610.010(6). The emphasis is not on the nature of the document, but on who prepared or retains the record. *See* LEWIS, RICE & FINGERSH, L.C., MISSOURI'S SUNSHINE LAW AND PUBLIC RECORDS LAW, at 9 (2d ed.1996).

■ Section 610.015 declares that "public records shall be open to the public for inspection and duplication." Although § 610.021 lists instances where public records may be closed, § 610.011.1 mandates that the exceptions to open records be strictly construed. "[P]ublic records must be presumed open to public inspection unless they contain information which clearly fits within one of the exemptions set out in § 610.021." *State ex rel. Mo. Local Gov't Retirement Sys. v. Bill,* 935 S.W.2d 659, 664[2] (Mo.App.1996).

■ In *Bill,* the western district held that the names of employees who received refunds of their contributions to the LAGERS retirement plan were not exempt from disclosure. *Id.* at 664–65[5]. This court in *Oregon County R–IV School Dist. v. LeMon,* 739 S.W.2d 553 (Mo.App.1987), held that a school district was required by the Sunshine Law to release the names, addresses, and

telephone numbers of all of its students to a man who wanted to publish a school directory.

> "The mandate of § 610.015 is that public records must be disclosed in the absence of another statute barring disclosure. The school district's argument, if accepted, would permit that mandate to be countermanded by an implication of a bar of disclosure rather than an express statutory bar. Such a result would not be in keeping with the legislative intent as pronounced in *Cohen v. Poelker,* [520 S.W.2d 50 (Mo.banc 1975) ]."

*Id.* at 560.

Applying the reasoning and analysis of *Oregon County R–IV* and *Bill,* we conclude that Missouri's Sunshine Law, specifically § 610.015, requires City to reveal the requested names and addresses of all new utility customers except those residential customers who request nondisclosure. To the extent that City's first point contends otherwise, it is denied.

■ City's second point claims that its records of utility customer hookups are exempt from disclosure because of § 610.021.14. That section allows governmental bodies to close records that are "protected from disclosure by law." City argues that the names and addresses of its utility customers are "confidential information" protected by what City characterizes as an individual's "constitutional right of privacy in avoiding disclosure of personal matters."[2] *See Whalen v. Roe,* 429 U.S. 589, 598–600, 97 S.Ct. 869, 876, 51 L.Ed.2d 64, 73 (1977) (discussing the concept of an individual privacy interest in avoiding disclosure of personal matters).[3]

■ In attempting to develop this point, City argues that its customers' interests in keeping their names and addresses private "outweighs the government's interest in revealing" their names and addresses. Accordingly, City says disclosure of its customers' names and addresses is exempted by § 610.021.14 since such information is " 'otherwise protected by law' through the constitutional right of privacy."[4]

Again, we note our amendment of the trial court's judgment to exclude disclosure of the names and addresses of residential hookups when the customers have requested confidentiality. If a residential customer has an expectation of privacy in his or her name and address—a question we need not and do not decide—that customer may request that this name and address not be revealed under the judgment as amended.

As to disclosure of the names and addresses of commercial hookups, City cites no authority for the notion that a commercial entity has a constitutionally protected expectation of privacy in its name and address. Our research does not reveal authority for such a notion. Therefore, we find that under the amended judgment, any constitutional right to privacy would not exempt City from revealing the names and addresses of new commercial hookups or names and addresses of new residential hookups when the customer has not requested confidentiality. City's second point is denied.[5]

---

2. City insists that an individual has a constitutional right not to have his or her private affairs made public by the government. According to City, its customers' private affairs include their "[n]ames and addresses, social security numbers, bank account numbers, and combinations to locks on buildings, etc." However, given our amendment of the judgment, City's claim regarding customer records, other than the names and addresses of new commercial and residential utility hookups, is no longer an issue.

3. The status of the notion of a constitutional right of privacy "still remains largely undefined." *See Whalen,* 429 U.S. at 598 n. 24, 97 S.Ct. at 876 n. 24 (quoting Professor Kurland).

4. City does not challenge the validity of Chapter 610 on constitutional grounds, hence we are not deprived of jurisdiction. *See Kansas City Star Co. v. Shields,* 771 S.W.2d 101, 103–04 (Mo.App. 1989).

5. We do not ignore the authorities cited by City. However, they are factually distinguishable and do not support City's argument. Thus, contrary to City's contention, *U.S. Dept. of Defense v. Fed. Labor Relations Auth.,* 510 U.S. 487, 114 S.Ct. 1006, 127 L.Ed.2d 325 (1994), turns on the supreme court's interpretation of the federal privacy act and not a claim of a constitutional right of privacy. 510 U.S. at 502–04, 114 S.Ct. at 1016–17, 127 L.Ed.2d at 339. Likewise, *Times Pub. Co. v. Michel,* 159 Pa.Cmwlth. 398, 633 A.2d

City's third and final point contends that the trial court erred in awarding attorney fees to Respondent. Preliminarily, we note—as did City in its brief—that the trial court did not give a reason for awarding attorney fees. However, City says, "[p]resumably," the attorney fee award was based on *Bill,* 935 S.W.2d 659.

In *Bill,* the western district interprets Missouri's Sunshine Law as requiring governmental bodies to pay the attorney fees of any defendant in a declaratory judgment suit brought pursuant to § 610.027.5. City maintains that *Bill* was wrongfully decided and urges us not to follow that case. Contrarily, Respondent insists that the western district's interpretation of § 610.027.5 is correct and should be followed.

In *Bill* the western district concludes that by using the phrase "at the expense of that governmental body" in § 610.027.5, the General Assembly intended that the governmental body was to bear *all* litigation expenses, including the respondent's attorney fees. *Id.* at 665–66[9]. City insists that *Bill* was wrongfully decided because the court's opinion mischaracterized the holding of one case it cited, specifically, *In re Mason,* 203 S.W.2d 750, 756 (Mo.App.1947).

City's claim that the western district has mischaracterized the holding in *Mason* is valid.[6] However, the western district's reliance on *Mason* does not defeat their conclusion that a governmental body should pay the attorney fees of its opponent under § 610.027.5.

In part, § 610.027.5 states:

"A public governmental body which is in doubt about the legality of closing a partic-ular ... record ... may bring suit *at the expense of that public governmental body* ... to ascertain the propriety of any such action ...." (emphasis supplied).

In *Bill,* the western district concluded that the language "at the expense of that public governmental body" was ambiguous. 935 S.W.2d at 665. The *Bill* court then turned to § 610.011.1 that says in part:

" 'It is the public policy of this state that ... records of public governmental bodies be open to the public unless otherwise provided by law. Sections 610.010 to 610.028 shall be liberally construed ... to promote this policy.' "

*Id.* at 666. The western district continued, finding that the General Assembly intended the phrase "at the expense of the public governmental body" to mean that the "governmental body [was] to bear *all* of the expense of litigation, including the respondent's, and including the respondent's expenses on appeal." *Id.* at 666[10]. At that point, the *Bill* court turned to the question of whether attorney fees should be included as an expense and in answering "yes," it misread the *Mason* opirion. *See* note 6. Even so, we agree with the *Bill* court's interpretation of § 610.027.5 for reasons that follow.

As we observed in note 6, the *Mason* court relied on *Prudential,* 239 Mo.App. 188, 192 S.W.2d 1, to hold that attorney fees were not an allowable expense without a statute or agreement that expressly authorized taxing of such fees in addition to ordinary statutory costs. 203 S.W.2d at 759. However, *Pru-*

1233 (1993) and *Tribune–Review Pub. Co. v. Allegheny County Housing Auth.,* 662 A.2d 677 (Pa. Commw.Ct.1995) involve a controlling statute with different language from that found in Missouri's Sunshine Law. Moreover, none of these cases involve a claim of a constitutional right to privacy.

**6.** In *Mason,* the court of appeals adopted the opinion of Commissioner Sperry who was reviewing the report of Special Commissioner Hunter in a disbarment proceeding. Commissioner Sperry's opinion quoted a considerable portion of Special Commissioner Hunter's report. In *Bill,* the western district cited *Mason* attributing excerpts from Commissioner Hunter's report as part of the opinion of Commissioner Sperry. 935 S.W.2d at 666. However, Commissioner Sperry's opinion adopted by the court of appeals in *Mason,* specifically disagreed with Commissioner Hunter's reasoning that the attorney under review was justified in making a claim for attorney fees as a "collection expense." 203 S.W.2d at 759. Commissioner Sperry went on to cite *Prudential Insurance Co. v. Goldsmith,* 239 Mo.App. 188, 192 S.W.2d 1, 4 (1945) for the proposition that attorney fees as an "item of expense" would not be allowed absent express statutory authorization awarding attorney fees. *Mason,* 203 S.W.2d at 759.

*dential* involved a situation that required the term "expense" to be strictly construed.[7]

In contrast, we must interpret the phrase "at the expense" in a section of the Sunshine Law that must be liberally construed. § 610.011.1; *Bill,* 935 S.W.2d at 666. The mandate that we liberally interpret the Sunshine Law to promote the policy of open government, *MacLachlan v. McNary,* 684 S.W.2d 534, 537[2] (Mo.App.1984), significantly differs from the policy of strict construction identified in *Prudential.* For that reason, neither *Mason* nor *Prudential* is instructive in our analysis of what the legislature intended by the phrase "at the expense of" in § 610.027.5.

■ Construing the phrase "at the expense of the public governmental body" liberally, we conclude that the legislature meant that a public governmental body should pay the attorney fees of its opponent when such body brings a declaratory judgment pursuant to § 610.027.5. We note that a public body would bear any burden of expense for the two other options under § 610.027.5. Neither requesting an opinion of its own counsel nor requesting an opinion of the Attorney General is an adversary proceeding requiring the active participation of another party. A public governmental body would naturally pay for the expense of its own counsel to render an opinion regarding compliance with the Sunshine Law. A public governmental body would also bear the expenses required for its employees to prepare and apply for an opinion of the Attorney General. Since the public governmental body chooses what avenue to take under § 610.027.5, and must bear the expenses of the other two options, it follows that the public governmental body must bear all of the expenses of an action for declaratory judgment.

If this were not so, a public governmental body might choose the option under § 610.027.5 of bringing an action for declaratory judgment because that option would be cost prohibitive for the opposing party. The western district cogently expresses this conclusion in *Bill:*

> "Not requiring the public governmental body to bear Bill's expenses would open a means for public governmental bodies to thwart the public policy underlying the open meetings and records law. The agency would be free to 'test' the determination of anyone requesting its records by filing a lawsuit, putting that person in the dilemma of not defending his or her request in court or enduring the significant expense of doing so."

935 S.W.2d at 666.

Thus, an interpretation of this statute that promotes open government must construe the phrase "at the expense of that public governmental body" to include an opposing party's attorney fees. We find the trial court did not err in awarding Respondent $1,500 in attorney fees from City. City's third point is denied.

The judgment of the trial court is modified pursuant to Rule 84.14 to read as set forth in the body of this opinion. The judgment, as modified, is affirmed.

PARRISH, P.J. and MONTGOMERY, C.J., concur.

---

**7.** In *Prudential,* the court noted: "Defendant, being a gratuitous surety, is a favorite of the law. His liability is strictissimi juris and cannot be extended by implication or construction and not beyond the precise terms of his undertaking, which is to be strictly construed...." 192 S.W.2d at 3. Continuing, the *Prudential* court wrote: "The term 'costs' or 'expenses', as used in a statute, is not understood ordinarily to include

attorneys' fees.... However, it has been held that the clause 'expense of litigation' in a liability insurance policy would include attorneys' fees. But this bond does not include such a clause.... [I]t is our conclusion, *giving a strict construction* to the provision of the bond, as we must do, the plaintiff is not entitled to allowance of attorneys' fees...." *Id.* at 4[1, 8]. (citations omitted) (emphasis supplied).